STATE OF MAINE  
PENOBSCOT, ss

SUPERIOR COURT  
CRIMINAL DOCKET NO.  
CR-01-657

STATE OF MAINE

V.

THOMAS J. HART

)
)
)
)
)
)
)
)
)
)
)

DONALD L. GARBRECHT  
LAW LIBRARY

OCT 1 2002

ORDER

FILED AND ENTERED  
SUPERIOR COURT

SEP 19 2002

PENOBSCOT COUNTY

## BACKGROUND

The Defendant stands indicted for two counts of Gross Sexual Assault (17-A M.R.S.A. § 253(1)(B), Class A) and one count of Sexual Exploitation of a Minor (17-A M.R.S.A. §2922(1)(A), Class B). The Defendant was arraigned on the indictment on September 18, 2001; he pled Not Guilty and was admitted to bail on that same date. Attorney Smith was appointed as defense counsel.

On November 1, 2001, Attorney Smith filed a motion seeking a Title 15 Evaluation of the Defendant. This was granted on November 6, 2001 and Dr. John Hale, Jr. Ed. D. evaluated the Defendant and filed his Stage I report with the court on December 14, 2001.

Dr.Hale concluded that while the Defendant appeared to be suffering from a long standing paranoid personality disorder, he was competent to stand trial and further, that there was no basis to conclude that the Defendant lacked criminal responsibility due to mental disease or defect.

The Defendant's case was placed upon the trial docket but before it could be reached for trial, Attorney Smith moved to withdraw as the Defendant's counsel based on a breakdown in the attorney client relationship. The court granted the motion and appointed as counsel Attorney Baldacci, who apparently was then also representing the Defendant in an unrelated District Court matter.

On February 14, 2002, Attorney Baldacci filed a motion to withdraw citing a break down in the Attorney client relationship. This Motion was granted on February 15, 2002.

The Defendant then privately retained Attorney Thistle who entered his appearance as counsel for the Defendant on February 26, 2002. [1] Attorney Thistle filed a motion to withdraw as counsel on March 5, 2002 citing a break down in the attorney client relationship. Client and counsel apparently reconciled their differences and this motion was withdrawn on March 20, 2002 in open court. [2]

Attorney Thistle applied for and received funds to employ Dr. Brian Rines, PhD to perform an independent psychological evaluation of the Defendant. Dr. Rines examined the Defendant and based on his findings, Attorney Thistle filed a Motion for Competency Hearing on April 22, 2002. Dr. Rines' findings were communicated to Attorney Thistle by letter on April 24, 2002. Attorney Thistle filed this correspondence with the court in support of the motion.

The Defendant's case appeared on the May Superior Court trial docket and the court met with counsel at the call of the docket. Based on continuing questions pertaining to the Defendant's competency and because of the passage of time since the date of Dr. Hale's initial examination of the Defendant, the court ordered Dr. Hale to perform a follow up examination of the Defendant. This was done on May 13, 2002. Dr. Hale filed his report with the court on May 16, 2002 reaffirming his opinion that the Defendant was competent to stand trial.

On May 21, 2002, the court selected a jury for this case and scheduled the trial for May 29, 2000 with the understanding that whether the case would actually proceed to trial was dependent on the outcome of a competency hearing scheduled for May 28, 2002 [3] Because of the limited amount of time available during this jury trial week, the court conducted a partial competency hearing on May 28, 2002 and a partial hearing on May 29, 2002.

On May 28, 2002, the State presented the testimony of Dr. Hale who testified consistently with his reports from both his November 2001 and May 2002 exams that the Defendant clearly understood the criminal charges against him, that they were serious charges and that he faced a range of serious penalties and probable loss of liberty if convicted. Dr. Hale testified that the Defendant was very familiar with the court process and knew all of the major participants and their roles; he understood the adversarial nature of the trial process and he appreciated the concept of cross-examination. He also understood the plea options, including the "nolo plea" option that was available to him. Dr. Hale further testified that although the Defendant exhibited great distrust of attorneys,

---

[1] On May 21, 2002, the Defendant's retainer was exhausted and Attorney Thistle was appointed to represent the Defendant at State expense.

[2] Attorney Thistle filed a second motion to withdraw, again citing a break down in the attorney client relationship on March 30, 2002. This motion was denied on April 22, 2002.

[3] Prior to selecting a jury, the Defendant requested that he be excused from being present. The court discussed this issue with the Defendant and counsel outside the presence of the jury. The Defendant personally articulated his view that he would make a poor first impression upon the jury and that it would likely prejudice them against him. At that time, the Defendant's personal appearance was indeed poor and the court granted this request. A jury was then selected by counsel in the Defendant's absence.

in his opinion, the Defendant was capable of cooperating with his attorney. Dr. Hale was of the opinion that the Defendant was competent to stand trial.

On May 29, 2002, the court heard testimony from Dr. Brian Rines, PhD, who had also examined the Defendant. Dr. Rines testified that he agreed with all of the conclusions reached by Dr. Hale to the effect that the Defendant understood very well the seriousness of the charges that he faced and he understood the trial process and what his legal options were and that he possessed sufficient cognitive ability, perceptiveness, and judgment to enable him to participate in a trial. Dr. Rines however, was of the opinion that the Defendant's mental health issues and in particular, his distrust of lawyers, was so great that he was incapable of assisting any lawyer in his own defense and was therefore incompetent to stand trial.

Dr. Rines agreed that the Defendant had the capacity to assist his lawyer and pointed out that the key question was whether he *would* assist his attorney. Dr. Rines acknowledged that there was a volitional aspect to this question. Arguably, any Defendant can either choose to cooperate with and assist his lawyer or he can choose not to do so. The question for Dr. Rines was whether a possible decision by the Defendant not to assist counsel in this case would be the product of manipulative and knowing choice or the product of underlying mental illness.

During the course of the Defendant's testimony on May 28, 2002, information was presented to the effect that he had a number of physical ailments and also had a growth on his brain. Neither Dr. Hale nor Dr. Rines were aware of this aspect of the Defendant's medical history.

The hearing was recessed and counsel quickly obtained relevant records pertaining to the Defendant's health care provided by St. Joseph's Hospital. Dr. Rines reviewed these records before retaking the stand. Although the records were somewhat incomplete, they did confirm the Defendant's testimony in this regard. These records led Dr. Rines to testify that the Defendant might have a growth in the "command center" of the brain, which is an area responsible for executive functions, (e.g. making judgments).[4] Dr. Rines expressed an opinion that the undisputed presence of this growth may be significant to a determination of his competency to stand trial.

This hearing was recessed to afford an opportunity to investigate further the significance of this medical condition. The court ordered a Stage II examination of the Defendant to include a further examination of that would specifically address the question of whether a medical condition in the Defendant's brain was contributing to his current mental health status.

---

[4] The growth, or collection of fluid within the brain, was a subdural hygroma. Also at issue from a physiological perspective was a condition of cerebral atrophy associated with excessive alcohol consumption.

Pursuant to this order, Dr. Hale examined the Defendant again and filed his Stage II report on June 20, 2002. Psychiatrist Dr. James Maier, M.D also examined the Defendant on June 21, 2002 and filed his contribution to the Stage II report on August 8, 2002.[5]

Dr. Hale's views remained unchanged and in his report, Dr. Maier concurs with the findings of Dr. Hale and Dr.Rines that the Defendant understands the legal process, the seriousness of the charges, the role of the various participants, and the extent of his legal jeopardy. Dr. Maier was unable to predict whether the Defendant would in fact cooperate with his attorney and observed that the Defendant has demonstrated a variable willingness to cooperate in his own defense over the course of his case. Although commenting that he had fewer medical records available to him than what he would have preferred, Dr. Maier stated that,

> "It's certainly possible that whatever the cause of the presumed subdural hematoma or collection of fluid in the frontal area of Mr. Hart's brain, that it's location might contribute to diminished judgement or increased pulsivity. However, the precise role, if any, that this lesion or the more generalized cerebral atrophy might be playing in his overall clinical picture is impossible to determine. The scant medical reports that are available and the defendant's own comments would seem to minimize its importance."[6]

Later in his report, Dr. Maier indicates that these basic conclusions would probably not be altered by more complete information.

The court has observed the Defendant on each of his three court appearances in connection with this issue and has had the opportunity to listen to his testimony and to the oral presentations that he has made on his own behalf on each court appearance.

## DISCUSSION

To be competent to stand trial, a defendant must be capable of understanding the nature and object of the charges against him, of comprehending his own condition in reference thereto, and of cooperating with counsel to conduct a defense in a rational and reasonable manner. _State v. Lewis_, 584 A.2d 622,624 (Me 1990) citing _State v. Hewitt_, 538 A.2d 268, 269 (Me 1988).

---

[5] Only limited medical records were available at the time of Dr. Rines' testimony and the Defendant initially agreed to sign an authorization releasing any and all medical records to a medical doctor for review. He then apparently changed his mind, causing his counsel to communicate to the Clerk that the Defendant was refusing to supply the required authorization. For reasons unknown to the court, the Defendant then changed his mind again and provided the required authorization. Dr. Maier's report suggests he had access to only limited medical records but the court is unable to account for this given the broad language of the release provided.

[6] During the examination with Dr. Maier, the Defendant stated that he felt the psychological evaluation was unnecessary because, It's not a question of whether I am competent, it's a question of will (emphasis in original) I cooperate!"

All three mental health professionals who have examined the Defendant share the view that he is capable of understanding the nature and object of the charges against him; that he understands the judicial process and the role of the major participants in the trial process and that he is capable of comprehending the extent of the jeopardy that he faces from the pending charges as well as his options for proceeding.

There is disagreement regarding whether he is capable of assisting counsel in the presentation of a defense in a rational and reasonable manner. Both Dr. Hale and Dr. Rines presented as thoughtful, competent, mental health experts offering well-reasoned opinions supported by the available evidence. They are in honest professional disagreement on this question. The court interprets Dr. Maier's report as indicating that probably neither the Defendant's cerebral hygroma nor his cerebral atrophy interfere with the Defendant's capacity to cooperate with and assist his counsel in the presentation of his defense and therefore are not significant factors for the court to consider in determining the issue of competency.

The court finds by a preponderance of the evidence that the Defendant is competent to stand trial. The court bases its determination upon the concurring testimony and reports of the three mental health experts who have examined the Defendant. The court resolves the sole question where there is disagreement, i.e. whether the Defendant has the capacity to cooperate with counsel in the presentation of his own defense, based on its own observations of the Defendant on the three occasions he has appeared in court.

The Defendant testified at the hearing on May 28, 2002 and demonstrated a full and complete awareness of the legal process and of the charges that he faces. The Defendant used the opportunity of his testifying to promote his long-standing request to be released on bail in order to pursue his own investigation of the evidence the State will seek to introduce against him. In support of this request, the Defendant articulated his belief that he was the victim of a "shakedown" operation being conducted by young people in pursuit of drugs and cigarettes. He also opined that the photographic evidence in the State's possession was "doctored" and that he could establish this himself by going to his apartment and taking photographs which would demonstrate that the background scenes of the State's photographs are not consistent with the layout and/or surroundings of his apartment, the alleged local of the sexual encounters which form the basis for his indictment. The court notes that the file in this case contains numerous hand written letters from the Defendant that repeatedly request his release on bail.[7] Notwithstanding that the Defendant used his court appearance to promote his own agenda of requesting bail, the court observed him to be a bright and articulate person who demonstrated a full awareness of his circumstances and that the central issue to the hearing was his competence to stand trial.

During the course of the testimony presented at the hearings held on both May 28 and May 29, the court observed the Defendant frequently interacting with his attorney at the defense table. He was obviously paying close attention to the proceedings and he could

---

[7] The Defendant's bail was revoked on October 12, 2001 for bail violations and he has been confined at the Penobscot County Jail since that date.

be seen to take issue with some aspects of the testimony of Dr. Hale and to suggest questions to his lawyer to be asked of Dr.Rines during his examination.

While it is evident that the Defendant has some underlying mental health issues, the court does not find that these compel a finding that the Defendant is incompetent to stand trial. Indeed, Maine law recognizes that a person may suffer from mental disease or defect within the purview of our diminished capacity statute and yet still be competent to stand trial. _State v. Bowman 681 A.2d 469,471 (Me 1996)._[8] It is also evident that there has been conflict between the Defendant and the lawyers who have attempted to represent him but these circumstances also do not compel a finding that the Defendant is incapable of assisting counsel. The Defendant is clearly a difficult client for counsel to assist. Based on its own observations of the Defendant however, the court is persuaded by a preponderance of the evidence that the Defendant has the capacity to cooperate with his counsel in this case. The court has observed the Defendant clearly engaged in cooperative activity with Defense counsel when he perceives it to be to his advantage to do so. If the Defendant chooses not to cooperate with Defense counsel, as he may well do, the court is satisfied that this will be the product of volition and not mental illness.

The entry shall be: The Defendant is found competent to stand trial and the Clerk is directed to place this matter on the next available trial list.

Date: 9/18/2002

JUSTICE, SUPERIOR COURT

---

[8] 17-A M.R.S.A. § 39.